WARSHAW BURSTEIN, LLP
Martin R. Lee, Esq. (ML-0920)
mlee@wbny.com
Attorneys for Plaintiff
555 Fifth Avenue
New York, NY 10017
(212) 984-7700

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

BREE JOHNSON,

                                      Plaintiff,

-against-

PLANET ORGANIC HOLDING CORP. d/b/a
NATURAL MARKETS FOOD GROUP,
PATRICK BROWN, JOSH TANNER, RONALD
MEINDERS and ABC CORPORATIONS 1-3,

                                  Defendants.
-------------------------------------------------------------X

Civil Action No.: 17-cv-07855-CS

**FIRST AMENDED COMPLAINT**

**Jury Trial Demanded**

       Plaintiff Bree Johnson ("Plaintiff" or "Johnson"), by and through her attorneys, Warshaw Burstein, LLP, as and for her First Amended Complaint against Defendants Planet Organic Holding Corp. d/b/a Natural Markets Food Group, Patrick Brown, Josh Tanner, Ronald Meinders, and ABC Corporations 1-3 alleges as follows:

### PRELIMINARY STATEMENT

       1.     Plaintiff brings this action against Planet Organic Holding Corp. d/b/a Natural Markets Food Group, Patrick Brown, Josh Tanner, Ronald Meinders, and ABC Corporations 1-3 (collectively, the "Defendants"), for their unlawful discrimination and retaliation against Plaintiff based on her sex and pregnancy, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*, the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et*

*seq.*, the Family Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.*, the New York State Human Rights Law, and New York Executive Law §§ 290 *et seq.*

## THE PARTIES

2.      Plaintiff Bree Johnson is an individual residing in the State of New York, City of New York.

3.      Upon information and belief, Defendant Planet Organic Holding Corp. d/b/a Natural Markets Food Group ("NMFG"), is a New York State corporation with its company headquarters at One Bridge Street, 2nd Floor, Suite 3, Irvington, New York, 10533.   Upon information and belief, NMFG is privately owned by Catalyst Capital, a Toronto-based private equity firm.

4.      NMFG is an employer within the meaning of 42 U.S.C.A. § 2000e-(b) and the New York State Human Rights Law.

5.      NMFG operates various grocery stores throughout the United States and Canada. Upon information and belief, NMFG is the parent company of Mrs. Green's Natural Market, Inc. ("Mrs. Green's"), a domestic corporation incorporated in the State of New York.

6.      Upon information and belief, Defendant Patrick Brown ("Brown") is an individual, residing in the State of New York.

7.      Brown was the Chief Executive Officer of NMFG from July 2014 until November 2016.

8.      Upon information and belief, Defendant Josh Tanner ("Tanner") is an individual residing in the State of New York.

9.      Tanner was the Director of Operations of NMFG during the relevant period of Plaintiff's employment.

10.     Upon information and belief, Defendant Ronald Meinders ("Meinders") is an individual residing in the State of New York.

11.     Meinders was the Store Manager at NMFG's flagship store in Tarrytown, New York.

12.     Upon information and belief, Laura-Sue Boggi ("Boggi") is an individual residing in the State of New York.

13.     Boggi is currently the Senior Director of Human Resources ("HR") at NMFG.  In this position, Boggi bears the ultimate responsibility for ensuring the accuracy of any HR-related documents (e.g. employee files, company policies and procedures, etc.) submitted to the EEOC in this action.

14.     The true names of defendants sued herein as ABC Corporations 1-3 are presently unknown to Plaintiff, who therefore sues these defendants by such fictitious names.  Plaintiff will seek to amend this complaint and include these unknown defendants' true names when they are ascertained.  Each of the fictitiously-named defendants are responsible in some manner for the conduct alleged herein and for the damages suffered by Plaintiff.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action and Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a), and pursuant to 42 U.S.C. § 2000e-5(f).  Additionally, this Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

16.     Venue is proper in this district under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f) because a substantial part of the events giving rise to the claims alleged herein occurred within this Judicial District.

**EEOC DETERMINATION**

17.     Plaintiff filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").  The EEOC issued a Notice of the Right to Sue on October 4, 2017, permitting Plaintiff to bring this action.  A copy of the Notice of Right to Sue is annexed hereto as Exhibit A and incorporated herein by reference.

**STATEMENT OF FACTS**

**Plaintiff's Employment at NMFG**

18.     In February 2014, Plaintiff was hired by NMFG as a manager in the Hartsdale, New York store.

19.     Plaintiff has always been one of the top performers throughout her educational and professional career, and Plaintiff remained a stellar employee throughout her tenure at NMFG.

20.     Indeed, within the first month of Plaintiff's employment, the Vice President of Finance for NMFG asked Plaintiff to work with him in the corporate office to train other stores' personnel on a new ordering system that had just been implemented.  Plaintiff accepted and shortly thereafter began traveling all over New York and Connecticut to train personnel at all of the local Mrs. Green's stores.

21.     Several months later, in May 2014, Plaintiff began working with the then-Chief Information Office ("CIO") on business cases and proposals for new IT projects.  After several months of exceptional work, Plaintiff was promoted to a Business Analyst in the corporate office and given a $20,000 raise.

22.     However, after the CIO was "let go," Sherry Schultz, the Chief Human Resources Officer, asked Plaintiff to help manage the new "Pilot Project" at the Tarrytown, New York

location, which was being completely remodeled and would serve as the company's new Flagship store.

23.     In January 2015 Plaintiff began working at the Tarrytown location on a daily basis. Plaintiff consistently "exceeded expectations" and received positive feedback for her ability to increase employee morale, develop trust with the employees, and raise the standards in the store. Both the Store Manager and Human Resources praised Plaintiff's excellent job performance.

**Defendants Discriminatory and Retaliatory**
**Conduct on the Basis of Plaintiff's Pregnancy**

24.     On May 2, 2015, during a casual conversation on the sales floor before the store opened, Plaintiff informed Josh Tanner, the Director of Operations, that she was pregnant.

25.     On or about May 4, 2015, Plaintiff also informed Ronald Meinders, the Tarrytown Store Manager, of her pregnancy.  The conversation took place in the Manager's office in the Tarrytown store, and was witnessed by Jeanne Maglione, the Director of Nutrition and Wellness.

26.     Although Plaintiff had always received favorable performance reviews, once Plaintiff announced her pregnancy Defendants immediately began searching for pretextual reasons to make negative comments about her and discriminate against her because of her pregnancy.

27.     For example, on May 6, 2015, less than a week after Plaintiff's pregnancy announcement, Plaintiff was called into an "impromptu" meeting with Meinders and Kelly Garretson ("Garretson"), the Human Resources Generalist, purportedly to discuss Plaintiff's role in the Tarrytown store and the associated duties and tasks.  At this meeting, Plaintiff for the first time, was given a job description, despite having been in the position for over four (4) months. Even more troubling was that the job description—which included "stooping, lifting, and climbing" in the expected tasks—had been deliberately revised on May 5, 2015, just one (1) day after Plaintiff informed Meinders of her pregnancy.

28.     Then, on May 19, 2015—less than three (3) weeks after Plaintiff disclosed her pregnancy—she was called into a meeting with Meinders and Laura-Sue Boggi, the Senior Manager of Learning and Development, and given her first ever disciplinary write-up in her career with NMFG titled "Written Warning for Overall Poor Leadership Performance." The write-up referred to an incident that occurred in early May 2015 with an employee who lashed out at Plaintiff (swearing, insults, etc.) on the sales floor before giving Plaintiff her oral resignation. Plaintiff became flustered because of the employee's invectives. Therefore, Plaintiff asked a fellow manager to obtain the employee's written resignation before the employee left the building. Although this manager was of the same rank as Plaintiff and had authority to handle employee discipline issues, Meinders' disciplinary write-up unjustifiably alleged that Plaintiff's request put her fellow manager in an "awkward position." Meinders also unfairly accused Plaintiff of breaching confidentiality by speaking with two members of the corporate office—the PR representative for NMFG and the supervisor of the employee who resigned—who asked Plaintiff to explain what had happened. Plaintiff explained to Meinders that she was approached by these individuals and had no way of knowing that they were not supposed to know what had happened. Although Plaintiff expressed objections to the accusations in the write-up, she felt coerced into signing the document as she was afraid that refusing to sign would attract negative attention from HR during her pregnancy.

29.     Defendants' barrage of discriminatory behavior continued when, on May 27, 2015, Meinders insinuated that he had found Plaintiff asleep on the store's covered porch a few days earlier. Plaintiff clarified that she was resting during her lunch break, on the very chairs provided by the company for that purpose, because she was not feeling well due to her pregnancy and wanted to make sure she was restored before her lunch break was over. (Indeed, this amenity was so

valued by employees that even employees from other NMFG locations would drive to Tarrytown to enjoy the porch.)  Although Meinders appeared discomfited by Plaintiff's answer, he said he understood and ended the conversation.

30.     However, on June 5, 2015, Plaintiff was again called into an unscheduled meeting with Meinders where he served Plaintiff with a Final Warning for resting her eyes outside of the store during her lunch break—even though the issue had been ostensibly resolved during their prior conversation.  Meinders did not show Plaintiff the document he had brought for her to sign, but, instead, bullied and orally harassed Plaintiff for almost two (2) hours, telling her that she set a poor example and did not portray a good image for the store.  This incident is clear evidence of Defendant's unlawful discrimination against Plaintiff on the basis of her pregnancy, as non-pregnant employees, including senior personnel, often took their lunch breaks in this public area but did not suffer disciplinary action.  Moreover, to Plaintiff's knowledge, there is no company policy prohibiting employees from resting or closing their eyes while on their lunch breaks.

31.     As another example of Defendants concerted discrimination efforts, selecting a day when Plaintiff was not at work, Plaintiff's company cell phone was abruptly disconnected on June 4, 2015, with no notice.  Upon inquiring as to why her cell phone had stopped working, Omar Bristia, an IT member, informed Plaintiff that he had been instructed to deactivate Plaintiff's phone and then requested that she turn it in upon her return to the store.  Shortly thereafter, Meinders—without Plaintiff's knowledge or permission—gave Plaintiff's personal cell phone number to vendors to contact Plaintiff when she was not at the store.  Defendant never offered any explanation as to why Plaintiff's phone was taken away.  It was simply a spiteful way to inconvenience Plaintiff for having the temerity to be pregnant, while having the gall to enable vendors to reach her outside of her work hours by calling her on her personal cell phone.

32.     On June 7, 2015, Plaintiff emailed Tanner and Meinders regarding her pregnancy to follow up and confirm the dates that she had notified them.  Neither Tanner nor Meinders ever responded.

33.     On June 8, 2015, Plaintiff was ill with pregnancy-related symptoms.  She called Meinders to inform him that she needed to go to the doctor.  Less than five (5) minutes after ending her call with Meinders, Plaintiff received an email from Garretson to schedule a meeting at the corporate office.  Plaintiff immediately responded that she had to go to the doctor that day regarding some health issues, but confirmed her availability for June 9, 2015.  Plaintiff added that, over the past few weeks, she had developed anxiety and panic attacks that were affecting her physical and mental health, due to the recent harassment and write-ups at work and the associated unfair accusations.  She stated that she looked forward to addressing these issues with Garretson at the upcoming meeting.  The next day, Garretson—instead of acknowledging Plaintiff's concerns—claimed that she had to postpone the meeting with Plaintiff.

34.     Garretson subsequently rescheduled the meeting for June 17, 2015, to "review the concerns raised by several members of management" and to discuss Plaintiff's concerns.

35.     On June 17, 2015 Plaintiff met with Garretson for approximately 2.5 hours in the cash office at the Tarrytown store.  Plaintiff stated that she believed she was being targeted and discriminated against because of her pregnancy—as evidenced by the fact that Plaintiff had never received any disciplinary write-ups or performance warnings prior to announcing her pregnancy.  Plaintiff also reiterated that Defendant's discrimination and harassment on the basis of her pregnancy was causing Plaintiff to suffer anxiety and panic attacks.

36.     Garretson attempted to rebut Plaintiff's complaint of discrimination by offering a list of alleged "infractions" dating back to the beginning of Plaintiff's employment at NMFG.

Plaintiff denied Garretson's accusations, as these purported "infractions" were either incidents that had never before been brought to Plaintiff's attention or situations that had already been resolved without any negative feedback from NMFG. Thus, it was clear to Plaintiff that the proffered "examples" were simply provided as a pretext to conceal Defendant's discriminatory motivation and actions.

37.     These alleged infractions included the following incidents:

(a)     In March 2014, several hundred dollars went missing from the safe at the Hartsdale store. NMFG interviewed all managers, including Plaintiff, during its investigation. Plaintiff assumed the issue had been resolved as she was never contacted again regarding this incident.

(b)     Also in March 2014, Plaintiff notified the Hartsdale Store Manager that managers were improperly preventing Juice Bar employees from taking their breaks, in violation of the federal and state labor laws. Plaintiff also informed the employees that they were required to take their 30-minute breaks and that they would need to be reimbursed for any untaken breaks which were automatically deducted from their pay. However, during the June 17, 2015 meeting Garretson complained that this had caused her a lot of trouble, as she had to go back into the system to determine how many missed breaks were owed to an employee asking to be paid for the breaks she did not take. Shockingly, Garretson attempted to blame the company's non-compliance on Plaintiff, who was simply advising her employees and superiors of legally mandated labor law requirements.

(c)     Garretson falsely accused Plaintiff and her then-fiancé (who was the Store Manager of the Stamford, CT store) of acting inappropriately when Plaintiff was conducting employee training at the Stamford location in the spring of 2014.

(d)     In February 2015 the credit card system was inoperable in the Tarrytown location for several hours during a busy afternoon and the store did not have any manual credit card machines.  During the meeting, Garretson accused Plaintiff of exercising poor judgment by marking down baskets to appease angry customers without cash—and that Plaintiff instead should have written down customers' credit card information on paper and charged them later, a ludicrous "solution" which would have obviously angered waiting customers even further and risked losing return shoppers.  Critically, although this incident occurred in February, Defendants seemingly took no issue with Plaintiff's conduct until many months later and only _after_ her pregnancy was announced in May—clearly demonstrating the pretextual nature of these accusation.

(e)     In early June 2015, Patrick Brown, NMFG's Chief Executive Officer, visited the Tarrytown location and spoke with Plaintiff in the store (it is to be noted that Plaintiff was already "showing" at that time).  Following this visit Brown allegedly complained to Garretson regarding Plaintiff's performance, even questioning why Plaintiff was allowed to open the store on her own.  It is evident that Brown—who had barely acknowledged

Plaintiff since her pregnancy was announced—was unlawfully discriminating against Plaintiff on the basis of her pregnancy.

38.     Garretson ended the June 17, 2015 meeting by recommending that Meinders and Plaintiff "get lunch" in order to get to know each other better.  Garretson also remarked that it seemed like a lot had been misunderstood with Plaintiff's performance.

39.     Defendants then increased their retaliation against Plaintiff because of her protected complaint of discrimination to Garretson.

40.     On July 30, 2015, Plaintiff was approached by Meinders regarding a particular transaction involving Plaintiff on July 25, 2015.  Plaintiff provided Meinders with the original paperwork and receipts from the transaction, demonstrating that she had <u>corrected</u> a system error in which the company had overcharged Plaintiff by $15.90 when her 20% employee discount was not applied, by putting the difference owed on a gift card.  In case there were any questions, Plaintiff entered her manager code to ensure that the transaction would point back to her and made a copy of the paperwork.

41.     In fact, Plaintiff purposely entered her own manager code to ensure complete transparency and because having another manager enter his or her code would have confused the issue when, in the case that they were questioned, they had no knowledge of what took place during the original transaction and would in the end have simply referred back to Plaintiff.

42.     Although this transaction was an adjustment/correction for a company system error, the transaction was classified as a "return" in the system simply because <u>NMFG had no key on the register for this type</u> of "one-off" situation.  Furthermore, there is nothing included about these situations in the company cash handling/purchase/refund policy under which Plaintiff was required to operate.

43.     During Plaintiff's July 30th conversation with Meinders regarding this transaction, Meinders made copies of the paperwork and said "That should be fine."  Meinders then sent the paperwork to Loss Prevention and advised Plaintiff to run that kind of transaction by him or another manager next time.

44.     However, on August 6, 2015, Garretson and Meinders called Plaintiff into a meeting at the Tarrytown store, without prior notice, to discuss again the July 25th transaction.  In response to Garretson's questions, Plaintiff affirmed that she had been trained on cash handling policies and understood those policies.  Plaintiff also explained to Garretson why she did not have another manager enter their code and repeatedly emphasized that the transaction **was a correction and not a return.**

45.     Garretson repeatedly stated that the validity of Plaintiff's transaction, as well as the time between the original transaction and Plaintiff's correction, were not in question.  Garretson claimed that the only issue was that Plaintiff had used her own manager code, and that, instead, Plaintiff "could have intimidated" the cashier, Natasha Dunkley, into processing the transaction for her.  Once Plaintiff informed Garretson that she would never do something like that, Garretson declared that this transaction had to result in Plaintiff's automatic termination.  Garretson added that Plaintiff should not bother applying for unemployment because Garretson would fight it.  Garretson then asked Plaintiff for her key and nametag and Meinders escorted Plaintiff out of the building.  This conversation lasted approximately fifteen (15) minutes.

46.     Based on the foregoing, it is incontrovertibly and abundantly clear that Defendants engaged in a concerted unlawful effort to discriminate and retaliate against Plaintiff because of her pregnancy.  Indeed, as is shockingly obvious from the above timeline, Defendants—from the very moment Plaintiff disclosed her pregnancy—began to foment a campaign of pretextual negative

assessments of Plaintiff's performance in an effort to force Plaintiff out of her position. However, Defendants' pretextual justifications are belied by the Affidavit of Jane McLoughlin, Plaintiff's former superior, attesting to Plaintiff's superior performance.[1]   Thus, it is indisputable that Defendant's proffered justifications for Plaintiff's mistreatment and termination are nothing more than pretexts to conceal Defendants' true discriminatory and retaliatory motivations.

**Defendants Conspired to Defraud the**
**EEOC and Further Injure Plaintiff**

47.     Defendants continued their practice of discrimination and retaliation even after Plaintiff's unlawful termination.

48.     Indeed, Defendants conspired to defraud the EEOC, and further injure and retaliate against Plaintiff, by submitting forged and fraudulent documents in connection with its Position Statement, dated January 4, 2017.   It is incontrovertible that this guilty behavior is tantamount to an admission of wrongdoing.

49.     Egregiously, many of the exhibits provided by NMFG were altered and/or fabricated after the fact.   In doing so, Defendants demonstrated not only their intent to continue victimizing Plaintiff, but also their utter indifference to the administrative process designed to protect employees from discrimination.

50.     For example, "Exhibit F" submitted by NMFG, intended to document an alleged February 2015 training session, is indisputably fabricated as there is a notification at the top of the email stating: *"We won't be able to deliver this message to Bree Johnson, Kelly Garretson, Jane Mcloughlin. Their email addresses are no longer valid"* and the cursor is still highlighted at the

---

[1] A copy of Ms. McLoughlin's Affidavit, dated April 3, 2017, is annexed hereto as <u>Exhibit B</u>.

end of the message.  Thus, it is obvious that this "email" is actually a screenshot of a message that was drafted after-the-fact and never sent.

51.     As another example, NMFG submitted, as "Exhibit I," a falsified "Memo of Verbal Discussion" purporting to document an April 23, 2015 verbal warning.  However, this discussion never actually occurred.  Critically, of the three (3) warnings NMFG submitted in its defense, this is the only "warning" pre-dating Plaintiff's pregnancy announcement—and it is also entirely fabricated.  Indeed, this "write-up" is: (i) not signed or dated by Meinders, (ii) not signed by Plaintiff, and does not otherwise indicate that Plaintiff refused to sign the document, and (iii) in an entirely different format than the May 19, 2015 and June 5, 2015 warnings (submitted as Exhibits "K" and "L," respectively).  This clearly demonstrates that NMFG created this fraudulent exhibit after-the-fact to submit as "evidence" to the EEOC to disguise the fact that Plaintiff had never received any negative feedback until after her May 2015 pregnancy announcement.

52.     Finally, and perhaps most importantly, the "policy" proffered by NMFG to the EEOC to justify Plaintiff's unlawful termination **did not actually exist at that time**—and was specifically altered after Plaintiff's termination.  However, NMFG's efforts to defraud the EEOC as to company policies are belied by the fact that NMFG provided three (3) different versions of its associate purchases and discount policy (as Exhibits "D," "N," and "Q"), and two (2) different versions of its return policy (as Exhibits "D" and "O").  These exhibits are further proof of Defendants scheme to defraud the EEOC by fabricating documents to conceal their discriminatory and retaliatory conduct.

53.     As is evident from NMFG's own EEOC submissions, Defendants have no legitimate evidence to support their pretextual justifications for Plaintiff's mistreatment and termination.  In fact, NMFG's fabrication of evidence is, in and of itself, an admission of guilt

demonstrating that Defendants unlawfully discriminated against Plaintiff on the basis of her pregnancy.

54.     Moreover, Defendants' concerted efforts to defraud the EEOC are part of a larger scheme by Defendants to discriminate and retaliate against employees who try to defend their rights.  For instance, in 2013, the National Labor Relations Board ("NLRB") charged NMFG with violating federal labor laws and illegally interrogating and intimidating employees in the weeks leading up to a union vote.  Then, in 2014, the NLRB again charged NMFG for unlawfully terminating eight (8) employees in retaliation for supporting the union.  Also in 2014, the Ontario Labour Relations Board held that NMFG had violated Canadian labor laws by terminating approximately fifty (50) unionized employees when the restaurant relocated to a new space 50 yards away from the original location.

55.     The pretextual and discriminatory nature of Defendants' purported justifications for terminating Plaintiff is further confirmed by a 2014 lawsuit alleging that NMFG's Chief HR Officer, Sherry Nolan-Schultz, (while at her previous employer) had negative views of pregnancy employees as Nolan-Schultz once encouraged a non-pregnant employee to learn a pregnant employee's job (even though the pregnant employee planned on returning to work) and commented that pregnant employees who take maternity leaves "never come back."  See Mete v. Sears Holdings Corporation, N.D. Ill., Case No. 14-CV-4169.

56.     The violation of employee's rights at every opportunity is quite clearly a pervasive aspect of NMFG's modus operandum; Bree Johnson is one more victim.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
(Pregnancy Discrimination in Violation of Title VII)

57.     Plaintiff repeats each and every allegation contained in the foregoing paragraphs as if herein set forth at length.

58.     Title VII makes it unlawful to discriminate against any individual in the terms, conditions, or privileges of employment, on the basis of sex, including on the basis of pregnancy, childbirth, or related medical conditions.

59.     By the conduct as alleged herein, Defendants, separately and together, have discriminated against Plaintiff in violation of Title VII by unlawfully terminating her employment on the basis of her sex, including her pregnancy.

60.     As a direct and proximate result of defendants' unlawful discrimination against Plaintiff on the basis of her pregnancy, Plaintiff has suffered and continues to suffer substantial damages, including economic harm, including the loss of wages, compensation, advancement opportunities, and other employment benefits, in an amount to be proved at trial.

61.     As a direct and proximate result of defendants' unlawful discrimination against Plaintiff on the basis of her pregnancy, Plaintiff has suffered and continues to suffer severe damages, including emotional distress, anxiety and panic attacks, humiliation, and mental anguish, in an amount to be proved at trial.

62.     Defendants acted with malice and reckless indifference to Plaintiff's protected civil rights, for which Plaintiff is entitled to an award of punitive damages in an amount to be proved at trial.

## SECOND CLAIM FOR RELIEF
(Retaliation in Violation of Title VII)

63.     Plaintiff repeats each and every allegation contained in the foregoing paragraphs as if herein set forth at length.

64.     Title VII makes it unlawful to retaliate against an employee for engaging in a protected activity.

65.     By the conduct as alleged herein, Defendants, separately and together, have retaliated against Plaintiff in violation of Title VII by unlawfully terminating her employment after she engaged in the protected activity of objecting to discrimination on the basis of her pregnancy and reporting such discriminatory conduct to Human Resources.

66.     As a direct and proximate result of defendants' unlawful retaliation against Plaintiff, Plaintiff has suffered and continues to suffer substantial damages, including economic harm, including the loss of wages, compensation, advancement opportunities, and other employment benefits, in an amount to be proved at trial.

67.     As a direct and proximate result of defendants' unlawful retaliation, Plaintiff has suffered and continues to suffer severe damages, including emotional distress, anxiety and panic attacks, humiliation, and mental anguish, in an amount to be proved at trial.

68.     Defendants acted with malice and reckless indifference to Plaintiff's protected civil rights, for which Plaintiff is entitled to an award of punitive damages in an amount to be proved at trial.

## THIRD CLAIM FOR RELIEF
(Violation of the Americans with Disabilities Act)

69.     Plaintiff repeats each and every allegation contained in the foregoing paragraphs as if herein set forth at length.

70.     The Americans with Disabilities Act ("ADA") includes pregnancy as a "disability" for purposes of determining the protected status of employees.

71.     Defendants engaged in a practice or policy in which Plaintiff, while disabled due to pregnancy, was treated less favorably than non-disabled employees.

72.     Defendants' practices complained of herein were facially discriminatory.

73.     Defendants' discriminatory practices and policies did not constitute a bona fide occupational qualification reasonably necessary to the normal operation of Defendants' business or enterprise.

74.     Defendants' discriminatory practices caused Plaintiff to forego benefits and other favorable treatment that were afforded to other employees.

75.     Defendants engaged in said ongoing, recurrent and continuous unlawful employment practices which amounted to a hostile work environment and continual harm to Plaintiff.

76.     As a direct and proximate result of defendants' unlawful discrimination against Plaintiff on the basis of her pregnancy, Plaintiff has suffered and continues to suffer severe damages, including emotional distress, anxiety and panic attacks, humiliation, and mental anguish, in an amount to be proved at trial.

### FOURTH CLAIM FOR RELIEF
(Violation of the Family Medical Leave Act)

77.     Plaintiff repeats each and every allegation contained in the foregoing paragraphs as if herein set forth at length.

78.     Defendants engaged in a practice or policy in which Plaintiff, while ill, injured or pregnant, was treated less favorably than other employees.

79.     Defendants' practices and policies were facially discriminatory.

80.     Defendants' discriminatory practices and policies did not constitute a bona fide occupational qualification reasonably necessary to the normal operation of Defendants' business or enterprise.

81.     Defendants' discriminatory practices amounted to a denial of medical leave during Plaintiff's pregnancy and illness during her employment.

82.     Defendants' discriminatory practices caused Plaintiff to forego benefits and other favorable treatment that were afforded to other employees.

83.     As a direct and proximate result of defendants' violations of the Family Medical Leave Act and unlawful discrimination against Plaintiff on the basis of her pregnancy, Plaintiff has suffered and continues to suffer severe damages, including emotional distress, anxiety and panic attacks, humiliation, and mental anguish, in an amount to be proved at trial.

### FIFTH CLAIM FOR RELIEF
(Pregnancy Discrimination in Violation of
New York State Human Rights Law)

84.     Plaintiff repeats each and every allegation contained in the foregoing paragraphs as if herein set forth at length.

85.     By the conduct as alleged herein, Defendants, separately and together, have discriminated against Plaintiff in violation of New York State Human Rights Law by unlawfully terminating her employment on the on the basis of her sex, including her pregnancy.

86.     As a direct and proximate result of defendants' unlawful discrimination against Plaintiff on the basis of her pregnancy, Plaintiff has suffered and continues to suffer substantial damages, including economic harm, including the loss of wages, compensation, advancement opportunities, and other employment benefits, in an amount to be proved at trial.

87.     As a direct and proximate result of defendants' unlawful discrimination against Plaintiff on the basis of her pregnancy, Plaintiff has suffered and continues to suffer severe damages, including emotional distress, anxiety and panic attacks, humiliation, and mental anguish, in an amount to be proved at trial.

88.     Defendants acted with malice and reckless indifference to Plaintiff's protected civil rights, for which Plaintiff is entitled to an award of punitive damages in an amount to be proved at trial.

### SIXTH CLAIM FOR RELIEF
(Retaliation in Violation of New York State Human Rights Law)

89.     Plaintiff repeats each and every allegation contained in the foregoing paragraphs as if herein set forth at length.

90.     By the conduct as alleged herein, Defendants, separately and together, have retaliated against Plaintiff in violation of the New York State Human Rights Law by unlawfully terminating her employment after she engaged in the protected activity of objecting to discrimination on the basis of her pregnancy and reporting such discriminatory conduct to Human Resources.

91.     As a direct and proximate result of defendants' unlawful discrimination against Plaintiff on the basis of her pregnancy, Plaintiff has suffered and continues to suffer substantial damages, including economic harm, including the loss of wages, compensation, advancement opportunities, and other employment benefits, in an amount to be proved at trial.

92.     As a direct and proximate result of defendants' unlawful discrimination against Plaintiff on the basis of her pregnancy, Plaintiff has suffered and continues to suffer severe damages, including emotional distress, anxiety and panic attacks, humiliation, and mental anguish, in an amount to be proved at trial.

93.     Defendants acted with malice and reckless indifference to Plaintiff's protected civil rights, for which Plaintiff is entitled to an award of punitive damages in an amount to be proved at trial.

## SEVENTH CLAIM FOR RELIEF
### (Aiding and Abetting Pregnancy Discrimination)

94.     Plaintiff repeats each and every allegation contained in the foregoing paragraphs as if herein set forth at length.

95.     Plaintiff was terminated on the basis of her sex, including her pregnancy, in violation of the New York State Human Rights Law.

96.     Defendant Patrick Brown aided and abetted discrimination against Plaintiff in the terms, conditions, and privileges of her employment, on the basis of Plaintiff's pregnancy status and/or in retaliation for Plaintiff's engagement in protected activities including but not limited to complaints of discrimination.

97.     Defendant Josh Tanner aided and abetted discrimination against Plaintiff in the terms, conditions, and privileges of her employment, on the basis of Plaintiff's pregnancy status and/or in retaliation for Plaintiff's engagement in protected activities including but not limited to complaints of discrimination.

98.     Defendant Ronald Meinders aided and abetted discrimination against Plaintiff in the terms, conditions, and privileges of her employment, on the basis of Plaintiff's pregnancy status and/or in retaliation for Plaintiff's engagement in protected activities including but not limited to complaints of discrimination.

99.     As a result of the aiding and abetting engaged in by Defendants Brown, Tanner, and Meinders, Plaintiff has suffered and continues to suffer substantial damages, including

economic harm, including the loss of wages, compensation, advancement opportunities, and other employment benefits, in an amount to be proved at trial.

100.    As a result of the aiding and abetting engaged in by Defendants Brown, Tanner, and Meinders, Plaintiff has suffered and continues to suffer severe damages, including emotional distress, anxiety and panic attacks, humiliation, and mental anguish, in an amount to be proved at trial.

**EIGHTH CLAIM FOR RELIEF**
(Intentional Infliction of Emotional Distress)

101.    Plaintiff repeats each and every allegation contained in the foregoing paragraphs as if herein set forth at length.

102.    The conduct of Defendants, its agents, servants and/or employees, toward Plaintiff was so outrageous and shocking that it exceeded all reasonable bounds of decency as measured by what the average member of the community would tolerate.

103.    Defendants acted purposefully with the intent to cause severe emotional distress to a pregnant and expecting mother.

104.    Defendants, their agents, servants and/or employees' conduct toward Plaintiff caused severe emotional distress to Plaintiff.

105.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer severe damages, including emotional distress, anxiety and panic attacks, humiliation, and mental anguish, in an amount to be proved at trial.

106.    Defendants acted with malice and reckless indifference to Plaintiff's protected civil rights, for which Plaintiff is entitled to an award of punitive damages in an amount to be proved at trial.

## NINTH CLAIM FOR RELIEF
(Defendants Conspiracy to Commit Fraud)

107.   Plaintiff repeats each and every allegation contained in the foregoing paragraphs as if herein set forth at length.

108.   By the conduct as alleged herein, Defendants acted in concert to discriminate unlawfully against Plaintiff on the basis of her sex, including her pregnancy, and to retaliate unlawfully against Plaintiff after she engaged in the protected activity of objecting to discrimination on the basis of her pregnancy and reporting such discriminatory conduct to Human Resources.

109.   Defendants maliciously conspired together, with an intent to injure and retaliate further against Plaintiff, to fabricate and falsify material evidence submitted to the EEOC deliberately intended to defraud the Commission.

110.   In furtherance of the conspiracy, Defendants created forged and falsified documents designed to misrepresent materially and conceal the true nature of their unlawful discriminatory and retaliatory actions.

111.   In doing so, the Defendants intended to defraud the EEOC, obstruct and delay the administrative process, and re-victimize Plaintiff by interfering with her recovery of damages duly owed by NMFG.

112.   Moreover, Defendants' submission of false documents was in furtherance of a fraudulent scheme to discriminate and retaliate systematically against any employees who try to protect and defend their civil rights.

113.   As a result of Defendants unlawful conduct, Plaintiff suffered economic, emotional, and psychological damages.

114.   In committing the acts described above, Defendants acted with malice toward

Plaintiff, and plaintiff is entitled to recover exemplary and punitive damages, in an amount to be determined at trial.

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

(a)  As to the First, Second, Third, Fourth, Fifth, Sixth, Seventh and Eighth claims for relief:

    i.  An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including but not limited to, the loss of wages, compensation, advancement opportunities, and other employment benefits;

    ii.  An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to, compensation for her severe emotional distress, anxiety and panic attacks, humiliation, and mental anguish;

    iii.  An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment interest;

    iv.  An award of punitive damages, in an amount to be determined at trial;

    v.  An award of reasonable attorneys' fees and the costs of this action;

(b)  As to the Sixth claim for relief:

    i.  An award for compensatory and incidental damages in an amount to be determined at trial, plus prejudgment interest;

    ii.  An award of punitive and exemplary damages to penalize Defendants for their intentional and malicious misconduct, in an amount to be determined at trial, but believed to be no less than $1,000,000.00, plus interest and the costs of this action including counsel fees; and

(c)      Such other and further relief as the Court may deem just and proper.

Dated: New York, New York
          October 23, 2017

WARSHAW BURSTEIN, LLP
*Attorneys for Plaintiff*

By: _____
           Martin R. Lee (ML-0920)
           555 Fifth Avenue
           New York, New York 10017
           (212) 984-7700
           mlee@wbny.com